# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| EUGENE W. SIMPSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 2:14-cv-01593-RDP-JHE |
| ) | |
| NURSE CLABO, et al.,[1] ) | |
| ) | |
| Defendants. ) | |

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Eugene Simpson filed a *pro se* complaint pursuant to 42 U.S.C. § 1983, alleging rights, privileges, or immunities afforded him under the Constitution or laws of the United States have been abridged during his incarceration at Donaldson Correctional Facility in Bessemer, Alabama. (Doc. 1).[2] The plaintiff names as defendants Nurse Clabo, Dr. Roddam, Dr. Hood, and Warden Cheryl Price. (*Id.* at 1, 3). The plaintiff complains he was denied adequate medical care for his serious medical needs. (*Id.* at 3-5). Specifically, the plaintiff asserts a finger on his right hand had to be amputated due to the defendants' deliberate indifference to his medical needs. (*Id.* at 3-5). The plaintiff seeks compensatory and punitive damages. (*Id.* at 5). In accordance with the usual practices of this Court and 28 U.S.C. § 636(b)(1), the complaint was referred to the undersigned magistrate judge for a preliminary report and recommendation. *See McCarthy v. Bronson*, 500 U.S. 136 (1991).

---

[1] The plaintiff named "Nurse Claybo," "Dr. Rottman," and "Dr. Head" as defendants in his complaint. (Doc. 1 at 1, 3). In their waivers of service, (docs. 8-10), and all pleadings filed thereafter, these defendants have spelled their names as "Patsy Clabo, HAS, RN," "Roy Roddam, M.D.," and "Hugh Hood, M.D." The undersigned uses the spellings the defendants provided for their names.

[2] All citations to the record refer to the document and page number provided by the court's electronic filing system, CM-ECF.

1

**I. Procedural History**

On July 2, 2015, the undersigned entered an Order for Special Report directing the Clerk to forward copies of the complaint to the named defendants and requesting the defendants file a special report addressing the plaintiff's factual allegations. (Doc. 7). The Order for Special Report advised the defendants that the special report could be submitted under oath or accompanied by affidavits and, if appropriate, would be considered as a motion for summary judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Rule 56"). (*Id.*). The order further advised the plaintiff that, after he received a copy of the defendant's special report, he should file counter-affidavits if he wished to rebut the matters the defendants presented in their special report within twenty days after receiving a copy of the special report. (*Id.*).

On July 24, 2015, defendant Price filed a special report with an affidavit, (doc. 12), and on August 13, 2015, defendants Clabo, Hood, and Roddam filed a special report, with affidavits and medical evidence attached, (doc. 14). Thereafter, the undersigned entered an order construing the special reports as motions for summary judgment and notifying the plaintiff he would have twenty days to respond to the motions for summary judgment and to file affidavits or other material if he chose. (Doc. 16). The order advised the plaintiff of the consequences of any default or failure to comply with Rule 56. *See Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985). After being granted an extension of time, (doc. 16), on October 5, 2015, the plaintiff filed oppositions to the defendants' motions. (Docs. 18 ¶ 19).

**II. Summary Judgment Standard**

Because the defendants' special reports are being construed as motions for summary judgment, the court must determine whether the moving parties, the defendants, are entitled to

judgment as a matter of law. Summary judgment may be granted only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56. In making that assessment, the court must view the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Chapman v. AI Transport,* 229 F.3d 1012, 1023 (11th Cir. 2000). The burden of proof is upon the moving party to establish a prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial, and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Bennett v. Parker*, 898 F.2d 1530, 1532-33 (11th Cir. 1990). As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." [citations omitted]. Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

*Bennett*, 898 F.2d at 1532. However, any "specific facts" pled in a *pro se* plaintiff's sworn complaint must be considered in opposition to summary judgment. *See Caldwell v. Warden, FCI Talladega,* 748 F.3d 1090, 1098 (11th Cir. 2014) (citing *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986)).

### III. Summary Judgment Facts

On June 13, 2013,[3] the plaintiff slipped on a wet floor while reaching for his wheelchair and hurt a finger on his right hand. (Doc. 1 at 3; doc. 14-1 at 10). The plaintiff was taken to the health care unit where the doctor on duty ordered x-rays of the plaintiff's hand. (Doc. 14-1 at 10). The x-rays, taken on June 24, 2013, indicate the plaintiff had a dislocation in his right hand. (*Id*. at 13). Because of the severity of the dislocation, the plaintiff was referred to an orthopedic surgeon at Brookwood Hospital. (Doc. 1 at 4). However, by the time the plaintiff was returned to Brookwood Hospital for surgery, the orthopedic surgeon told him the only option to amputate his finger. (*Id*. at 5). As a result, the plaintiff continues to suffer pain on a daily basis. (*Id*.). He seeks monetary compensation from the defendants for his pain and suffering. (*Id*. at 4).

Defendants Clabo, Roddam, and Hood agree the plaintiff fell and injured his finger, albeit on June 21, 2013, and not June 13, 2013. (Doc. 14-1 at 3). The plaintiff was scheduled for an x-ray the next day, June 22, 2013. (*Id.*). Also on June 21, 2013, the plaintiff was seen by non-party Doug Green, R.N., who noted the plaintiff's right hand and wrist had been splinted, and the plaintiff was instructed to return to the infirmary if his pain increased or if numbness or tingling occurred. (*Id*. at 4, 11).

An x-ray of the plaintiff's right hand was taken on June 24, 2013. (Doc. 14-1 at 13). Notes indicate the plaintiff's little finger was dislocated and identified a fracture of the fifth metacarpal bone. (Doc. 14 at 3; doc. 14-1 at 13-14). Defendant Roddam then saw the plaintiff on June 27, 2013, and ordered an orthopedic consultation. (Doc. 14-1 at 4, 14-17). The

---

[3] The plaintiff asserts he fell on this date, but all of the medical records concerning the plaintiff's hand injury reflect the date of the fall as June 21, 2013. (*See, e.g*., doc. 14-1 at 10-12).

following day, defendant Hood, Corizon's Regional Medical Director,[4] approved the consultation. (*Id*. at 14). A medical note dated July 3, 2013, reflects that the plaintiff "has not seen orthopedist." (Doc. 14-1 at 19). In those notes, defendant Roddam further wrote, "√ on ortho consult – I think the jt. will require surgery." (*Id*.). For reasons the defendants did not explain, arrangements were made for the plaintiff to be examined by non-party Dr. Ostrowski, even though "[t]he earliest that Dr. Ostrowski could see Mr. Simpson, after scheduling had been arranged with the Alabama Department of Corrections, was August 1, 2013."[5] (Doc. 14 at 4).

Dr. Ostrowski's notes from the August 1, 2013, office visit state the plaintiff had fallen and injured his right small finger "approximately 1 month ago." (Doc. 14-1 at 20). He further stated the plaintiff needed "pre-op general medical evaluation for surgical clearance" for a "CRPP vs. ORIF"[6] or "possible MP fusion," "possible amputation" or "possible pinning." (*Id*. at 20-21). That same day, after he returned to Donaldson, the plaintiff told the nurse that the orthopedic surgeon said he might lose his finger. (*Id*. at 22).

Defendant Hood cleared the plaintiff for hand surgery on August 2, 2013. (Doc. 14-1 at 24). However, the medical records reflect that on August 20, 2013, defendant Roddam arranged to see the plaintiff on August 22, 2013, and then cleared him for surgery. (Doc. 14-1 at 19, 26, 27). Defendant Hood approved the surgery on August 26, 2013. (*Id*. at 25). According to the

---

[4] Corizon, LLC, is under contract to the Alabama Department of Corrections to provide health care to inmates in Alabama prisons. (*See, e.g.*, doc. 14 at 2).
[5] Although the plaintiff repeatedly alleges he was not taken to Brookwood Hospital for 90 days, (*see, e.g.,* doc. 18 at 9; doc. 19 at 9), the medical records reflect that Dr. Ostrowski saw the plaintiff for the first time on August 1, 2013, which is fewer than 90 days from the date of the injury. If the plaintiff intended to state he was not taken for surgery for 90 days after his injury, the evidence supports that statement.
[6] Traditional management of unstable fifth carpal–metacarpal fracture–dislocation of the hand includes closed reduction and percutaneous pinning ("CRPP") versus open reduction internal fixation ("ORIF"). *See* http://www.ncbi.nlm.nih.gov/pmc/articles/ PMC2525872/

defendants, "[t]he earliest that Dr. Ostrowski could see Mr. Simpson, after scheduling had been arranged with the Alabama Department of Corrections, to perform the necessary surgery was September 26, 2013. (Doc. 14 at 6).

The surgical notes from Dr. Ostrowski on September 26, 2013, reflect the plaintiff

> Is a 73-year-old man who is an inmate at one of the Alabama prisons. He dislocated his metacarpophalangeal joint of his right small finger about a month prior to presenting to the clinic. It was unreduced for a month at that time. We noted that it would probably be difficult in this man's situation to perform any type of reconstructive surgery. We discussed the issues there, but I told him at his age and in his circumstance that it might be better with an amputation, and then two months before, he was able to get back to the clinic. By then, his dislocation had been present for 3 months and I thought the only reasonable operation in the patient at his age and in his circumstances would be amputation. He understood and agreed to proceed.

(Doc. 14-1 at 30).

Based on these facts, the defendants assert the plaintiff was never denied or delayed appropriate and necessary medical care. (Doc. 14-1 at 7). In Dr. Roddam's opinion, the treatment the plaintiff received was reasonable, appropriate, and within the applicable standard of care. (Doc. 14-1 at 8).

The defendants further assert that, during the relevant time period, defendant Clabo was the Health Services Administrator at Donaldson Correctional Facility, responsible solely for scheduling and responding to grievances. (Doc. 14 at 7). In regard to this injury, she neither provided medical care nor made treatment decisions concerning the plaintiff. (Doc. 14-2 at 3). Similarly, defendant Price states she had no involvement in any medical decisions made at Donaldson Correctional Facility with regard to the plaintiff.[7]  (Doc. 12-1 at 3).

---

[7] In response to the argument, the plaintiff states by affidavit that defendant Price refused to transfer him for outside medical care. (Doc. 18 at 9).

## IV. Analysis

### A.  Eighth Amendment Claims

The plaintiff asserts a claim for inadequate medical treatment against the defendants.  To establish liability under § 1983 for inadequate medical treatment, a prisoner must show that the failure to provide adequate treatment amounted to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.  Only "deliberate indifference to serious medical needs of prisoners" gives rise to a claim of cruel and unusual punishment in violation of the Eighth Amendment.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  "Medical treatment violates the eighth amendment only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Harris v. Thigpen,* 941 F.2d 1495, 1505 (11th Cir. 1991) (quoting *Rogers v. Evans,* 792 F.2d 1052, 1058 (11th Cir. 1986)).  To be actionable under § 1983, the conduct of prison officials must run counter to evolving standards of decency or involve the unnecessary and wanton infliction of pain.  *Bass v. Sullivan*, 550 F.2d 229, 231 (5th Cir. 1977).

There is a two part analysis to determine whether a plaintiff has been subjected to cruel and unusual punishment.  "First, [the court] must evaluate whether there was evidence of a serious medical need; if so, [the court] must then consider whether [the defendant's] response to that need amounted to deliberate indifference." *Mandel v. Doe,* 888 F.2d 783, 788 (11th Cir. 1989) (alterations added).  A "serious" medical need is "one that has been diagnosed by a physician as mandating medical treatment or one that is so obvious that even a lay person would easily recognize the need for a doctor's attention." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (citations omitted).

It is apparent that a finger requiring fusion or amputation constitutes a "serious" medical need for purposes of the Eighth Amendment. Thus, the next question is whether the defendants exhibited "deliberate indifference" to the plaintiff's serious medical condition. The test for deliberate indifference is subjective, based on the individual defendant's state of mind. *See McElligott v. Foley,* 182 F.3d 1248, 1255 (11th Cir. 1999) (citing *Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999) and quoting *Steele v. Shah*, 87 F.3d 1266, 1269 (11th Cir. 1996) ("[S]ince a finding of deliberate indifference requires a finding of the defendant's subjective awareness of the relevant risk, a genuine issue of material fact exists only if the record contains evidence, albeit circumstantial, of such subjective awareness.")). However, "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that a harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *McElligott*, 182 F.3d at 1255. To establish a claim for an Eighth Amendment violation based on deliberate indifference to a serious medical need, the Eleventh Circuit has summarized "four requirements: an objectively serious need, an objectively insufficient response to that need, a subjective awareness of facts signaling the need, and an actual inference of required action from those facts." *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000).

The plaintiff does not argue he received no care, rather he asserts the care he received was grossly delayed, thus exacerbating his injury. (*See e.g.,* doc. 19 at 2 (Noting that after the "determination was made that plaintiff's finger on his right hand was broken to a degree that an appointment at Brookwood Hospital was necessary . . . [n]inety days later the plaintiff still had not been taken to Brookwood Hospital for surgery . . . ."). In cases turning on the delay in

providing medical care, the court must consider: "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." *Goebert v. Lee County,* 510 F.3d 1312, 1327 (11th Cir. 2007).

Because the relevant medical records begin on June 21, 2013, the court considers the medical care provided from that date forward as it relates to each defendant.

      1.    Defendant Roddam

On June 27, 2013, defendant Roddam opined the plaintiff required an orthopedic consultation. That consultation did not take place until August 1, 2013. (Doc. 14-1 at 14-17). Thus, in addition to establishing an objectively serious need and an objectively insufficient response to that need, the evidence demonstrates Dr. Roddam was subjectively aware the plaintiff's need to see an orthopedic doctor. On June 27, 2013, he reviewed the x-ray films and noted they reflected a dislocation of the 5th metacarpal joint and a distal fracture of the same joint. (Doc. 14-1 at 14). Dr. Roddam concluded that the plaintiff required an orthopedic consult. (*Id*). On July 3, 2013, Dr. Roddam completed the paperwork for the plaintiff to be allowed to come to the health care unit for pain medication three times a day, for 30 days. (Doc. 14-1 at 18). Also on July 3, 2013, Dr. Roddam's notes reflect his belief that the fracture will require surgery and instructions to check on the orthopedic consultation. (*Id*., at 19). These facts are sufficient to draw an inference of deliberate indifference to the plaintiff's serious medical need on the part of Dr. Roddam.

Additionally, after seeing the orthopedic surgeon on August 1, 2013, with instructions to return within ten (10) days, Dr. Roddam did not perform a medical clearance consultation for the plaintiff until August 22, 2013. (Doc. 14-1 at 19). Further records reflect that Dr. Roddam did

9

not arrange for the plaintiff to have a medical clearance examination until August 20, 2013. (*Id*. at 26). Dr. Roddam knew the plaintiff was still awaiting surgery on September 5, 2013, because he completed the paperwork to allow the plaintiff to come to the infirmary twice a day for pain medication. (*Id*. at 29). These facts are sufficient to demonstrate both a subjective awareness of facts signaling the need for further medical care, and an actual inference of required action from those facts. *See Taylor,* 221 F.3d at 1258.

### 2. Dr. Hood

As previously stated, on August 1, 2013, the defendants were notified that the plaintiff would require surgery, but that the plaintiff needed prior medical clearance for the surgery. (*Id*. at 20-21). Dr. Hood signed a "Consultation Request" on August 2, 2013, seeking an "Off-site" consultation, noted to be "Urgent." (Doc. 14-1 at 24). Despite the August 2, 2013, consultation request, Dr. Roddam completed another "Consultation Request" on August 22, 2013, again seeking "Off-site" permission for surgery. (*Id.*, at 25). Dr. Hood approved that request on August 26, 2013. (*Id*.). At this point, the defendants were already sixteen days passed Dr. Ostrowski's direction that the plaintiff should return in ten days.[8] (doc. 14-1 at 21). As with Dr. Roddam, these facts demonstrate both a subjective awareness of facts signaling the need, and an actual inference of required action from those facts. *See Taylor*, 221 F.3d at 1258.

### 3. Nurse Clabo

In his sworn complaint, the plaintiff alleges that upon the determination the plaintiff needed outside medical care, Nurse Clabo was instructed to set an appointment for the plaintiff at

---

[8] The defendants argue that "[a]t no time did the orthopedic surgeon recommend Mr. Simpson's surgery was a medical emergency or that Mr. Simpson needed to be returned to him at a sooner date for surgery." (Doc. 14 at 13). This statement is belied by Dr. Ostrowski's office note that the plaintiff should have a follow up appointment in ten days. (Doc. 14-1 at 21).

Brookwood Hospital. (Doc. 1 at 3-4). Nurse Clabo does not dispute her duties included setting such appointments. Rather, by affidavit, Nurse Clabo asserts that she did not provide hands on nursing care to the plaintiff. (Doc. 14-2 at 3). Like Drs. Roddam and Hood, Nurse Clabo had access to all the facts which indicated that the plaintiff's hand required surgery. *See e.g., Goebert*, 510 F.3d at 1327-28. While the defendants collectively assert that the appointments were made for the plaintiff "after scheduling had been arranged with the Alabama Department of Corrections" (*see e.g.*, doc. 14-1 at 4), according to the defendants, Nurse Clabo's responsibilities included "scheduling and other administrative duties." (Doc. 14 at 7).

Moreover, none of these three defendants dispute that Dr. Ostrowski's medical records reflect both the seriousness of the plaintiff's need for surgery and that the three month delay in returning for orthopedic treatment worsened the plaintiff's condition.[9] "By then, his dislocation had been present for 3 months and I thought the only reasonable operation . . . would be an amputation." (Doc. 14-1 at 30). The operative report continues, "[t]he metacarpophalangeal joint was grossly distorted and completely dislocated with proximal phalanx sitting over the dorsum of the metacarpal head." (Doc. 14-1 at 31). Likewise, prison medical records from June 21, 2013, to September 24, 2013, indicate defendant Roddam was aware the plaintiff was in pain. (Doc. 14-1 at 14-19). Additionally, in his grievance form, filed as an exhibit in opposition to the defendants' motions, the plaintiff states Dr. Ostrowski informed him that, due to the delay in

---

[9] The plaintiff does allege a follow-up appointment was made for him to return in two weeks, but the Alabama Department of Corrections took the wrong prisoner. (Doc. 19 at 2). While the plaintiff offers no evidence beyond his own belief that this occurred, the evidence does reflect that despite being informed that the plaintiff needed surgery, and that he needed a general medical evaluation for surgical clearance, that medical clearance was not performed by Dr Roddam until August 22, 2013 and approved by Dr. Hood on August 26, 2013. The defendants offer no explanation as to the three week delay in performing an examination for purposes of medical clearance.

surgery, the tendons in the plaintiff's hand had time to wither and, therefore, amputation was the only option. (Doc. 18 at 13).

The plaintiff and the defendants' affidavits are contradictory as to the reasons for the delay in providing medical care. Clearly established law supports the proposition that "a defendant who delays necessary treatment for non-medical reasons may exhibit deliberate indifference." *Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011). Even when treatment is ultimately provided, deliberate indifference may be "inferred from an unexplained delay in treating a known or obvious serious medical condition," and the reason for the delay is relevant in determining whether there has been unconstitutional conduct. *Harris v. Coweta County*, 21 F.3d 388, 394 (11th Cir. 1994).

At best, defendants Clabo, Roddam, and Hood allege the delay in treatment was because "[t]he earliest that Dr. Ostrowski could see Mr. Simpson, after scheduling had been arranged with the Alabama Department of Corrections, was August 1, 2013." (Doc. 14 at 4). The defendants again allege that the plaintiff's surgery was not done for two more months because "[t]he earliest that Dr. Ostrowski could see Mr. Simpson, after scheduling had been arranged with the Alabama Department of Corrections, was September 26, 2013." (Doc. 14 at 6). Defendants Clabo, Roddam, and Hood rely wholly on defendant Roddam's affidavit, submitted with the defendants' motion for summary judgment, as support for these statements. (*See* doc. 14 at 4). Defendant Roddam provides no foundation as to how he has personal knowledge of these facts. Defendant Price fails to address the delay in treatment at all, stating instead that she was never involved in any health care decision related to inmate Simpson. (Doc. 12-1 at 3). Such allegations fail to provide any basis for the delay. Rather, a ninety day delay in treating an unreduced dislocated

hand joint is sufficient to create a genuine issue of material fact regarding deliberate indifference. *See, e.g., Harris,* 21 F.3d at 393-94 (holding that evidence of a "prominent unexplained" two month delay in treating a painful hand condition created a genuine issue of material fact about deliberate indifference); *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) ("When [defendants] ignore without explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference . . . . [A]n unexplained delay . . . in treating a serious injury states a prima facie case of deliberate indifference." ).

The defendants next assert, collectively, that, even if they were negligent in perceiving the significant risk the plaintiff faced, such negligence is insufficient for constitutional liability.[10] *See, e.g., Tucker v. Busbee,* –No. 14–12142, 2015 WL 4510000, *2 (11th Cir. 2015) (holding mere negligence or medical malpractice are insufficient to state a claim for deliberate indifference). Rather, the plaintiff must establish "conscious or callous indifference" as to each named defendant. *Harris,* 941 F.2d at 1506. Under the facts alleged here, a reasonable jury could conclude the delay in treatment was due to a "callous indifference" and not mere negligence. As previously stated, the defendants fail to adequately explain the delay in treatment.

In *Brennan v. Commissioner, Alabama Department of Corrections*, the Eleventh Circuit stated as follows:

> Brennan's allegation that Oakes and Dr. Talley were aware that he needed treatment, including surgery, but that he did not get that treatment for nearly four months, stated a plausible claim for relief. *See McElligott*, 182 F.3d at 1255; *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989) (holding that deliberate

---

[10] The defendants spend a good portion of their special report explaining that medical negligence alone does not give rise to a claim for deliberate indifference. (Doc. 14 at 11-14). The plaintiff's complaint does not assert that the treatment he did receive was deficient, but rather the length of time the defendants took to obtain that treatment violated his rights.

13

> indifference was shown where physician's assistant knew a prisoner was in pain after a fall, but refused to allow him to see a doctor or otherwise treat him for about one month).

–No. 14–13227, 2015 WL 5446933, *3 (11th Cir. Sept. 17, 2015). Similarly, in *Brown v. Hughes*, the Court stated that "[d]eliberately inflicted pain, as with an electric cattle prod, does not become unimportant and unactionable under the eighth amendment simply because the pain produced is only momentary. Even if we were to recognize as de minimus delays of a few seconds or minutes, a deliberate delay on the order of hours in providing care for a serious and painful broken foot is sufficient to state a constitutional claim." 894 F.2d at 1538 (11th Cir. 1990). Conduct that is more than mere negligence includes, *inter alia,* delaying treatment for non-medical reasons. *McElligott*, 182 F.3d at 1255. Even when treatment is ultimately provided, deliberate indifference may be "inferred from an unexplained delay in treating a known or obvious serious medical condition." *Id.*

Based on the foregoing, the defendants' motions for summary judgment are due to be denied as to the plaintiff's Eighth Amendment claims.

### B. Official Capacity, Individual Capacity, and Qualified Immunity of Defendant Price

Defendant Price contends that, even if her conduct violated the plaintiff's constitutional rights, she is immune from suit in her official capacity and entitled to absolute immunity from monetary damages. Official capacity lawsuits are "in all respects other than name . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). "A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, or Congress has abrogated the state's immunity. Alabama has not waived its Eleventh Amendment immunity and Congress has not abrogated Alabama's immunity. Therefore,

Alabama state officials are immune from claims brought against them in their official capacities." *Lancaster v. Monroe County*, 116 F.3d 1419, 1429 (11th Cir. 1997) (internal citations omitted).

Defendant Price is a state actor entitled to sovereign immunity under the Eleventh Amendment for claims against her in her official capacity. *Lancaster,* 116 F.3d at 1429; *Jackson v. Georgia Department of Transportation*, 16 F.3d 1573, 1575 (11th Cir. 1994). Any claim against defendant Price in her official capacity is therefore due to be dismissed.

Defendant Price further argues any claim against her in her individual capacity must be dismissed because of qualified immunity.[11] A delay in medical treatment as a form of deliberate indifference under the Eighth Amendment has been clearly established law for many years. The court applies an "objective-reasonableness test for evaluating actions of a government official claiming qualified immunity: the official's action must be evaluated against 'clearly established law,' consisting of statutory or constitutional rights that a reasonable person should have known." *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Eleventh Circuit has explained this analysis as follows:

1. The defendant public official must first prove that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."

2. Once the defendant public official satisfies his burden of moving forward with the evidence, the burden shifts to the plaintiff to show lack of good faith on the defendant's part. This burden is met by proof demonstrating that the defendant public official's actions "violated clearly established constitutional law."

---

[11] Defendant Price specifically argues that, "[c]learly, the plaintiff's complaint is against defendant, Warden Cheryl Price, in her official capacity." (Doc. 12, at 4). However, defendant Price then asserts she is entitled to qualified immunity in her individual capacity.

*Courson, id*. at 1487 (quoting *Rich v. Dollar*, 841 F.2d 1558, 1563-64 (11th Cir. 1988).

To show an official was acting within his discretionary authority, a government official must show "objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." *Courson,* 939 F.2d at 1487. Defendant Price readily admits that at all times she was acting within the line and scope of her discretionary authority. (Doc. 12 at 5). As to the second inquiry, delay in medical treatment as a basis for a constitutional violation is well established in this Circuit. Genuine issues of material fact preclude summary judgment for defendant Price in her individual capacity.

### C. Medical Malpractice under Alabama Law

Apparently out of an abundance of caution, defendants Clabo, Roddam, and Hood assert that any claim the plaintiff brings for medical malpractice under Alabama law is due to be dismissed. (Doc. 14 at 14-19). Having thoroughly searched the plaintiff's complaint and other pleadings, the undersigned finds no such claim or a factual basis that could support such a claim. Just as the plaintiff does not dispute that the treatment he eventually received was sufficient for constitutional purposes, the plaintiff brings no such allegations under state law. Rather, the plaintiff very clearly alleges that the ninety-day delay between his injury and his surgery – ultimately causing the amputation of his finger – was in deliberate indifference to his constitutional rights. He makes no claim for medical malpractice.

### V. Recommendation

Accordingly, the undersigned **RECOMMENDS** the defendants' motions for summary

judgment, (docs. 12 & 14), be **DENIED** except to the extent that any claim against Warden Price in her official capacity is due to be **DISMISSED**.

## VI. Notice of Right to Object

Any party may file specific written objections to this report and recommendation. Any objections must be filed with the Clerk of Court within fourteen (14) calendar days from the date the report and recommendation is entered. Objections should specifically identify all findings of fact and recommendations to which objection is made and the specific basis for objection. Failure to object to factual findings will bar later review of those findings, except for plain error. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986); *Dupree v. Warden*, 715 F.3d 1295, 1300 (11th Cir. 2013). Objections also should specifically identify all claims contained in the petition which the report and recommendation fails to address. Objections should not contain new allegations, present additional evidence, or repeat legal arguments. An objecting party must serve a copy of its objections on each other party to this action.

On receipt of objections, a United States District Judge will make a *de novo* determination of those portions of the report and recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings of fact and recommendations made by the magistrate judge. The district judge must conduct a hearing if required by law. Otherwise, the district judge may exercise discretion to conduct a hearing or otherwise receive additional evidence. Alternately, the district judge may consider the record developed before the magistrate judge, making an independent determination on the basis of that record. The district judge also may refer this action back to the magistrate judge with instructions for further

proceedings.

A party may not appeal the magistrate judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit. A party may only appeal from a final judgment entered by a district judge.

DONE this 28th day of January 2016.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE